# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-30190

United States Court of Appeals
Fifth Circuit

**FILED**

March 18, 2020

Lyle W. Cayce
Clerk

IBERIABANK CORPORATION,

    Plaintiff - Appellant

v.

ILLINOIS UNION INSURANCE COMPANY; TRAVELERS CASUALTY &
SURETY COMPANY OF AMERICA,

    Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana

Before WIENER and HIGGINSON, Circuit Judges.*

STEPHEN A. HIGGINSON, Circuit Judge:

This case turns on the scope of professional liability insurance policies issued to IberiaBank Corporation ("IberiaBank"). In late 2017, IberiaBank entered into an $11,692,149 settlement ("DOJ Settlement") with the United States Department of Justice ("DOJ"), under which it acknowledged that it provided mortgage certifications to the Department of Housing and Urban Development ("HUD") that did not meet all HUD requirements. The DOJ Settlement also resolved claims arising from a whistleblower *qui tam* action

---

* This case is being decided by a quorum. 28 U.S.C. § 46(d).

alleging violations of the False Claims Act ("FCA"). IberiaBank filed a claim with its primary and excess liability insurance providers, Illinois Union Insurance Company ("Chubb")[1] and Travelers Casualty and Surety Company of America ("Travelers") (collectively, "the Insurers"), requesting coverage for the DOJ Settlement. The Insurers denied IberiaBank's claim, arguing that it was not covered by IberiaBank's professional liability insurance policies with the Insurers ("the Policies"). IberiaBank sued the Insurers for breach of contract. The district court granted the Insurers' motions to dismiss, finding that the Policies provide no plausible claim for relief. IberiaBank appealed. We AFFIRM.

## I. FACTUAL BACKGROUND

### A. HUD's Direct Endorsement Lenders Program

The Federal Housing Administration ("FHA"), an agency within HUD, insures approved lenders against defaults on certain mortgage loans for single-family homes. 12 U.S.C. § 1708. The FHA insures loans only for individuals who fit its risk profile. Previously, HUD oversaw the "very staff-intensive and time-consuming" process of ensuring that the FHA insured lower-risk loans, which involved confirming that the borrowers insured by the FHA had sufficient credit. Delegation of Insuring Authority to Direct Endorsement Mortgages, 62 Fed. Reg. 30222-01, 30222 (June 2, 1997). To alleviate HUD of this burden, Congress authorized HUD to delegate the task of insuring mortgages using a Direct Endorsement Program ("DE Program"). *Id.*; 12 U.S.C. § 1715z-21; Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1997, Pub. L. No. 104-204, § 427, 110 Stat. 2874 (1996). Under the DE Program, Direct

---

[1] The parties refer to the Illinois Union Insurance Company policy as the "Chubb" policy because that is the name of the insurer's parent company.

No. 19-30190

Endorsement Lenders ("DE Lenders") agree to use HUD's mortgage underwriting standards when approving borrowers for home loans. DE Lenders analyze the credit risk of each borrower using HUD's guidelines, and then certify to HUD that approved borrowers meet HUD's underwriting standards. The FHA then insures the DE Lender in the event the insured borrower defaults. DE Lenders submit a formal certification to the FHA declaring that the mortgage complies with all HUD underwriting requirements.

IberiaBank is a DE Lender. As a DE Lender, IberiaBank collects its customary fees from borrowers as compensation for originating the loans.

**B. The Allegations Against IberiaBank and Settlement with the DOJ**

In 2015, a former IberiaBank employee and a then-current IberiaBank employee ("the Relators") brought a whistleblower *qui tam* action on behalf of the United States against IberiaBank, alleging that IberiaBank violated the FCA during its participation in the DE Program.[2] The Relators alleged that IberiaBank was non-compliant with HUD's underwriting requirements. Specifically, the Relators alleged that IberiaBank (1) improperly paid commissions to underwriters; (2) provided false loan certifications to HUD; (3) improperly certified compliance with HUD regulations; and (4) failed to report defective or fraudulent loans. As a result of this conduct, the Relators alleged that IberiaBank caused the FHA to pay insurance claims that it would not have paid if IberiaBank had conducted appropriate underwriting due diligence. The whistleblower *qui tam* action alerted the DOJ to potential wrongdoing by IberiaBank and, in April 2017, the DOJ informed IberiaBank of potential liabilities under the FCA.

---

[2] One Relator also brought employment-related claims against IberiaBank. These claims were excluded from the DOJ Settlement and IberiaBank does not seek coverage for those claims in this action.

3

No. 19-30190

The DOJ and IberiaBank entered into a Settlement Agreement on December 12, 2017, under which IberiaBank agreed to pay $11,692,149. In the Settlement Agreement, IberiaBank acknowledged that it certified certain mortgages to HUD that were ineligible for FHA insurance under HUD's guidelines. IberiaBank also acknowledged that it paid "incentive payments to underwriters and others who performed underwriting activities." Further, IberiaBank acknowledged that it did not disclose the existence of these incentive payments to HUD, despite certifying that it had ceased paying incentives to underwriters as of 2010. Finally, IberiaBank acknowledged that it failed to comply with HUD's self-reporting requirements when it became aware of loans that involved possible fraud or serious underwriting violations. However, IberiaBank did not acknowledge liability and "reserve[d] the right to contest the use or application of [the Settlement Agreement] in any future litigation." As a result of the DOJ Settlement, the FCA counts in the *qui tam* action were dismissed and the DOJ waived its right to pursue the remaining common law claims. After the DOJ Settlement, IberiaBank submitted a claim under the Chubb policy and, in the event its claim exceeded Chubb's coverage, submitted a claim under the excess Travelers policy as well. The Insurers denied coverage, giving rise to this lawsuit.

### C. The Insurance Policies and IberiaBank's Claim

IberiaBank held two banker's professional liability insurance policies—a primary policy and an excess policy. First, IberiaBank held a primary policy with a limit of $10,000,000 from Chubb. IberiaBank also held an excess policy with a limit of $5,000,000 from Travelers. The excess Travelers policy adopts the relevant language from the primary Chubb policy and, therefore, the analysis applicable to the Chubb policy applies to the Travelers policy.

The Insuring Clause of the Policies states:

No. 19-30190

The Insurer[3] shall pay on behalf of the Insureds[4] Loss[5] which the Insureds become legally obligated to pay by reason of any Claim first made by a third party client of the Company against the Insureds during the Policy Period or any applicable Discovery Period for any Wrongful Acts[6] in rendering or failing to render Professional Services, if such Wrongful Acts take place prior to the end of the Policy Period.

The Policies define "Professional Services" as:

[S]ervices performed by or on behalf of [IberiaBank] for a policyholder or third party client of [IberiaBank]. The Professional Services must be performed pursuant to a written contract with such policyholder or client for consideration inuring to the benefit of [IberiaBank].

Based on their interpretation of the terms "Professional Services" and "client," the Insurers interpreted the Policies to exclude IberiaBank's claim and, therefore, denied it.

In response to the Insurers' denial of IberiaBank's claim, IberiaBank sued, alleging breach of contract. IberiaBank argued that the DOJ Settlement "fell squarely within the Policies' broad insuring agreement for professional liability coverage because the Policies covered claims by a client for wrongful acts in rendering 'Professional Services.'" IberiaBank argued that it provided "Professional Services" to HUD when it underwrote mortgages as a DE Lender,

---

[3] The Insurer is Chubb and, to the extent Chubb's policy limit is exceeded, Travelers.

[4] The Insured is IberiaBank.

[5] "Loss" is defined as "the amount which the Insureds become legally obligated to pay on account of each claim and for all Claims in the Policy Period . . . made against them for Wrongful Acts for which coverage applies, including, but not limited to, damages, judgments, any award of pre-judgment and post-judgment interest, settlements and Defense Costs. Loss does not include (1) any amount for which the Insureds are absolved from payment, (2) taxes, fines or penalties imposed by law, (3) the multiple portion of any multiplied damage award, (4) punitive or exemplary damages, or (5) matters uninsurable under the law pursuant to which this Policy is construed."

[6] "Wrongful Act" is defined as "any error, misstatement, misleading statement, act, omission, neglect or breach of duty actually or allegedly committed or attempted by the Insured Persons in their capacity as such or by the Company."

5

and that the government (acting as IberiaBank's "third party client") claimed IberiaBank committed wrongful acts when rendering those services, bringing the DOJ Settlement within the Policies' Insuring Clause. The Insurers moved to dismiss, arguing that (1) the DOJ Settlement does not relate to "Professional Services" provided by IberiaBank, and (2) the government is not IberiaBank's "client."

On February 13, 2019, the district court granted the Insurers' motions to dismiss for failure to state a claim because (1) the government is not IberiaBank's "client" under the DE Program and (2) IberiaBank did not provide "Professional Services" to the government in its role as a DE Lender. The district court then entered an order dismissing IberiaBank's lawsuit against the Insurers. We affirm.

## II. PRELIMINARY ISSUES

### A. Jurisdiction and Applicable Law

This court has appellate jurisdiction under 28 U.S.C. § 1291 and diversity jurisdiction under 28 U.S.C. § 1332. In a diversity case, this court must apply state substantive law. As Louisiana's choice-of-law rules dictate and as the parties agree, Louisiana law applies to the interpretation of the insurance policies here, which were issued in Louisiana. *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003) ("Louisiana choice of law rules dictate . . . that in [an] action involving the interpretation of insurance policies issued in Louisiana, Louisiana substantive law governs."). When determining Louisiana law, this court first looks to "the final decisions of the Louisiana Supreme Court" and, absent guidance, we make an *Erie* guess to determine "how [the Louisiana Supreme Court] would resolve the issue if presented with the same case." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007). "In making an *Erie* guess, we must employ Louisiana's civilian methodology, whereby we first examine

primary sources of law: the constitution, codes, and statutes." *Id.* In Louisiana's civilian system, jurisprudence and existing caselaw are considered "a secondary law source." *Id.* (quoting *Prytania Park Hotel, Ltd. v. Gen. Star Indem. Co.*, 179 F.3d 169, 169 (5th Cir. 1999)). Thus, this court is "not strictly bound" by decisions of Louisiana's intermediate courts. *Id.*

### B. Standard of Review

This court's review of a district court's order granting a motion to dismiss for failure to state a claim is de novo. *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013). "This court construes facts in the light most favorable to the nonmoving party, 'as a motion to dismiss under 12(b)(6) is viewed with disfavor and is rarely granted.'" *Id.* (quoting *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011)) (internal quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Importantly, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.*

"Interpretation of an insurance contract generally involves a question of law." *Canal Breaches Litig.*, 495 F.3d at 206. Where an insurance contract precludes recovery under its very terms, dismissal is proper. *Id.* at 221. In evaluating the Insurers' motion to dismiss, this court can consider the pleadings, the motion to dismiss, and certain attachments to the motion to dismiss. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) ("[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's

No. 19-30190

complaint and are central to her claim."). Neither party challenges reliance on the DOJ Settlement or *qui tam* complaint, which were attached to the Insurers' motion to dismiss and referenced in IberiaBank's original complaint.

## III. ANALYSIS

### A. Louisiana Contract Principles

"An insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code." *Cadwallader v. Allstate Ins. Co.*, 848 So. 2d 577, 580 (La. 2003). "The words of a contract must be given their generally prevailing meaning." La. Civ. Code art. 2047 (2019). "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." *Id.* art. 2046; *see also Cadwallader*, 848 So. 2d at 580 ("If the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written."). "Words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning." *Cadwallader*, 848 So. 2d at 580. "Courts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms." *Id.* Courts should not "create an ambiguity where none exists." *Id.*

However, "[a]mbiguous policy provisions are generally construed against the insurer and in favor of coverage." *Id.*; *see also* La. Civ. Code art. 2056. This is known as Louisiana's "rule of strict construction." *Cadwallader*, 848 So. 2d at 580. The rule applies "only if the ambiguous policy provision is susceptible to two or more *reasonable* interpretations," meaning that "each of the alternative interpretations must be reasonable." *Id.* (citing *Carrier v. Reliance Ins. Co.*, 759 So. 2d 37, 43–44 (La. 2000)).

8

The burden rests with the insured to prove that an insurance policy covers a particular claim. *Jones v. Estate of Santiago*, 870 So. 2d 1002, 1010 (La. 2004). Here, the dispute concerns the scope of the insuring clause, not the scope of any exclusion. Therefore, IberiaBank bears the burden of proving that the DOJ Settlement is covered by the Policies. In the context of this case, that means that IberiaBank must prove that the government is a "third party client" and that IberiaBank rendered "Professional Services" to the government in its role as a DE Lender.

## B. Defining a "Third Party Client"

The Policies only cover claims "made by a third party client" of IberiaBank. The district court held that the government is not a "client" of IberiaBank. The district court concluded that IberiaBank's clients were the mortgagees who borrowed money from IberiaBank, not the government.

On appeal, IberiaBank argues that (1) the district court's reliance on the Black's Law Dictionary definition of "client" was incomplete; (2) *both* borrowers *and* the government can be IberiaBank's "clients"; (3) payment of consideration is not necessary for the government to become a "client"; and (4) Louisiana's "reasonable expectations" doctrine should apply to bring IberiaBank's claim within the scope of the Policies.

The Insurers respond that (1) the Black's Law Dictionary definition of "client" provides sufficient guidance regarding the plain and ordinary meaning of the term; (2) IberiaBank cannot claim that HUD is its "client" for purposes of the Insuring Clause and that its borrowers are its "client" for purposes of determining to whom it provides "Professional Services"; (3) the Insuring Clause, by incorporating the definition of "Professional Services," explicitly requires that the insured services be provided to a client who pays *consideration* to IberiaBank under written contract; and (4) the "reasonable expectations" doctrine is inapplicable because the policy is unambiguous.

No. 19-30190

Black's Law Dictionary defines "client" as "[a] person or entity that employs a professional for advice or help in that professional's line of work." *Client*, BLACK'S LAW DICTIONARY (11th ed. 2014). IberiaBank urges us to consider the definition of "employ[s]," which includes "[t]o make use of" or "[t]o use as an agent or substitute in transacting business." *Employ*, BLACK'S LAW DICTIONARY (11th ed. 2014). But IberiaBank's layered definition disregards a key restriction on the term "client" that appears on the face of the Policies. The definition of "Professional Services" makes clear that, to be insurable, services rendered by IberiaBank must be rendered to a "policyholder or client for consideration" and "pursuant to a written contract." HUD cannot be a "client" under the Policy because the certifications rendered to HUD were not provided "for consideration." HUD did not pay IberiaBank to provide the certifications.

IberiaBank next argues that HUD is the "client" who asserted a covered claim against IberiaBank, and that the borrowers are the "clients" to whom IberiaBank rendered its services (for consideration). According to IberiaBank, the former "client" meets the definition in the Insuring Clause and the latter "clients" meet the definition in the defined term "Professional Services" because the borrowers pay fees to IberiaBank.

IberiaBank's interpretation contravenes a tenet of Louisiana contract interpretation principles: "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code art. 2050; *see also La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So. 2d 759, 763 (La. 1994) ("[O]ne policy provision is not to be construed separately at the expense of disregarding other policy provisions."). IberiaBank incorrectly compartmentalizes the Insuring Clause. The Insuring Clause *incorporates* the definition of "Professional Services"; the two are not separate. Thus, under the terms of the Policies, the "client for consideration" is the same client toward whom IberiaBank's

No. 19-30190

"Wrongful Acts in rendering or failing to render" its services were directed. IberiaBank did not, however, engage in "Wrongful Acts" in *providing* mortgage loans *to* borrowers; rather, IberiaBank engaged in "Wrongful Acts" when it certified certain borrowers' creditworthiness *to* HUD when those borrowers did not meet all HUD requirements.

In *Elliott v. Continental Casualty Co.*, the Louisiana Supreme Court used similar reasoning to deny professional liability insurance. 949 So. 2d 1247 (La. 2007). There, an attorney, Elliott, sought malpractice insurance coverage for a claim brought by another attorney to whom he referred a case. *Id.* at 1248–49. Another attorney, Bandaries, sought damages because Elliott failed to inform him that Elliott had allowed a client's cause of action to prescribe by failing to timely file the claim before referring the client to Bandaries. *Id.* The insurance policy defined a "Claim" as "a demand received by the Insured for money or services arising out of an act or omission, including personal injury, in the rendering of or failure to render legal services." *Id.* at 1251 (emphasis omitted). The Louisiana Supreme Court granted the insurer's motion for summary judgment and denied coverage. *Id.* at 1255. Although Elliott's underlying act involved a "failure to render legal services," the policy was not triggered by Elliott's omission when transferring the case to Bandaries. *Id.* ("Elliott did not fail to render legal services for Bandaries, but rather, Bandaries alleged that Elliott failed to render legal services for [the client]. Bandaries' assertion, that Elliott 'malpracticed' by allowing [the client's] cause of action to prescribe, is *merely descriptive* of the type of *information* that Elliott allegedly withheld from Bandaries."). The rationale in *Elliott* applies here. Just as Elliott could not procure coverage for a claim brought by Bandaries on the basis of legal services rendered to the client, IberiaBank cannot procure coverage for a claim brought by the government on the basis of professional services rendered to IberiaBank's borrowers.

11

No. 19-30190

IberiaBank also cannot rely on Louisiana's "reasonable expectations" doctrine because the terms of the policy are unambiguous. Under Louisiana's "reasonable expectations" doctrine, "[a]mbiguity will . . . be resolved by ascertaining how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered." *La. Ins. Guar. Ass'n*, 630 So. 2d at 764. That doctrine does not apply when "the policy wording at issue is clear and unambiguously expresses the parties' intent," as it does here.[7] *Id.*

IberiaBank's reliance on *First Horizon National Corp. v. Houston Casualty Co.* is misplaced. *See* No. 15-cv-2235, 2016 WL 1749802, at *2 (W.D. Tenn. April 21, 2016). There, a bank sought professional liability coverage for a DOJ settlement that arose from its participation in the DE Program. *Id.* at *2. The district court in that case denied the insurer's motion to dismiss, partly because it was "undisputed that the DOJ/HUD settlement is the type of loss covered by the insurance policies at issue." *Id.* at *5. Of course, here, the entire dispute centers on whether the DOJ Settlement should be covered by these particular Policies. Therefore, *First Horizon* is inapt.

This court is entitled to "draw on its judicial experience and common sense" when interpreting contracts at the motion to dismiss stage. *Iqbal*, 556 U.S. at 679. Other courts have recognized in the context of medical-related FCA claims that it makes little sense for a professional liability insurer to be "on the hook" when a party "receive[s] sums of money for services it never provided." *Zurich Am. Ins. Co. v. O'Hara Reg'l Ctr. for Rehab.*, 529 F.3d 916, 923 (10th Cir. 2008). Similarly, here, IberiaBank's disgorgement of mortgage fees arising from loans it might not have offered absent FHA default insurance

---

[7] The fact that a policy term is undefined does not render the policy ambiguous. *Canal Breaches Litig.*, 495 F.3d at 209; *Sher v. Lafayette Ins. Co.*, 988 So. 2d 186, 193 (La. 4/8/08).

No. 19-30190

is an expense beyond the scope of the professional liability insurance Policies at issue.[8]

For these reasons, the government is not IberiaBank's "client" and did not become IberiaBank's "client" as a result of the DE Program. Therefore, IberiaBank's DOJ Settlement claim is not covered by the Policies and the district court properly granted the Insurers' motions to dismiss. We need not consider Travelers' alternative argument that its payment obligation is not triggered until IberiaBank exhausts its Chubb policy limits.

## IV. CONCLUSION

For these reasons, we AFFIRM the district court's order granting the Insurers' motions to dismiss.

---

[8] The parties also dispute whether IberiaBank's underwriting activities constituted "Professional Services," as that term is defined in the Policies. Because the government is not a "client," we need not consider whether IberiaBank was providing "Professional Services" when it performed its role as a DE Lender.